ROBERTS, Receiver, etc., *v.* HILL, Adm'r, etc.

*(Circuit Court, D. Vermont.   August 5, 1885.)*

1. NATIONAL BANK—CONTEMPLATION OF INSOLVENCY.
   A bank is in contemplation of insolvency when the fact becomes reasonably apparent to its officers that the concern will presently be unable to meet its obligations, and will be obliged to suspend its ordinary operations.

2. SAME—FRAUDULENT PREFERENCE—INTENT.
   The intent to give a preference is presumed when a payment is made to a creditor by a bank whose officers know of its insolvency, and therefore that it cannot pay all of its creditors in full.

3. SAME—MOTIVE FOR GIVING PREFERENCE.
   Where property is transferred by a bank to a creditor to avoid paying him the amount due him, and thus postpone the failure of the bank, it is none the less fraudulent and void.

4. SAME—ROBERTS *v.* FIRST NATIONAL BANK OVERRULED.
   On rehearing, former opinion (23 FED. REP. 311) is overruled, and transfer held fraudulent and set aside.

On Rehearing. See S. C. 23 FED. REP. 311.
*Roberts & Roberts,* for orator.
*Jed. P. Ladd* and *Henry C. Adams,* for defendant.
Before WALLACE and WHEELER, JJ.

WALLACE, J. Upon the rehearing of this cause, ordered by the judge who heard it originally, we have reached the conclusion that the transfer which is assailed by the bill should be set aside. The suit is brought by a receiver of the bank to set aside the transfer of a note for $8,031, the property of the bank, made to one McGregor, the defendant's intestate, on the twentieth of February, 1884. It is founded on section 5242, Rev. St., originally section 52 of the act of

June 3, 1864, to provide a national currency, etc., commonly known as the "National Bank Act," which is as follows:

"All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages; * * * and all deposits of money, bullion, or other valuable things for its use, or for the use of any of its shareholders or creditors; and all payments of money to either,—made after the commission of an act of insolvency, or in contemplation thereof, with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view of a preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void," etc.

The scheme of the act, of which this section is one of the provisions, contemplates a ratable distribution of the assets of national banks among their creditors in the event of insolvency; and the intention of congress, to secure equality among creditors by the appropriation of all the assets of an insolvent bank for a ratable division, is so dominating that the courts have held that a creditor cannot obtain a preference by adversary proceedings against the bank after insolvency has taken place. Accordingly, it has been adjudged that a creditor cannot acquire a lien upon the property of a national bank, after it has become insolvent, by a suit and an attachment of its property, although no receiver of the bank has been appointed; and that the attachment should be vacated upon the application of a receiver subsequently appointed, because it would be subversive of the theory of the national currency act to permit the creditor to obtain a preference thereby over the other creditors of the bank. *National Bank* v. *Colby*, 21 Wall. 609; *Harvey* v. *Allen*, 16 Blatchf. 29.

To effectually secure this equality among creditors the section in question substantially declares that all preferences made from the time when insolvency actual or potential occurs, shall be void. We are therefore to inquire whether the bank here had committed an act of insolvency, or was in contemplation thereof, and whether the transfer of the note in controversy was made with a view to give a preference to the creditor receiving it over the other creditors of the bank. The proofs show that the bank was insolvent at the time of the transfer and had been for a long time, but had succeeded in meeting all its obligations and in maintaining its credit, without any apparent embarrassments, until January 12, 1884, when a run occurred, which continued during that day and the following business day. The officers of the bank were able to borrow between $50,000 and $60,000, and met all the calls upon the bank and the run substantially subsided. From that time until early in April following, when the bank failed, its business was continued ostensibly as usual; but some of its depositors were apprehensive and withdrew their deposits; and in a number of instances securities were transferred by the officers of the bank out of its assets to depositors, who were willing to accept them in lieu of their money. The officers always represented that the bank was solvent, and always paid depositors who insisted upon being paid,

and undoubtedly supposed that there was no immediate danger of a suspension if the confidence of the depositors could be regained. Nevertheless, they knew that the situation was extremely critical and that the bank was hopelessly crippled; and although they supposed a failure might be deferred for a considerable period, they knew it might be precipitated at any time. The capital of the bank, $100,-000, had been wholly absorbed in losses, represented, in part, by over $60,000 of the paper of the president, $38,000 of the paper of the cashier, and the paper of one Marshall for between $70,000 and $80,-000. The debt of the president accrued in 1880. The Marshall debt, as early as in the spring of 1879, was from $40,000 to $50,000, and was then known by the officers of the bank to be precarious; but the bank had attempted to carry it for Marshall, and it gradually augmented. At the time of the failure the provable debts against the bank were about $290,000, and its whole available assets were $115,618, exclusive of the paper of Marshall, which was good for about $5,000, and the paper of the president and cashier, both of whom were insolvent, and of about $20,000 of other doubtful assets.

Mr. McGregor held certificates of deposit, bearing interest, for the aggregate sum of $8,850. He became solicitous in consequence of the run, and shortly before the transaction in question, he called upon the officers of the bank with his certificates. They told him he could have his money if he wanted it, and that the bank was all right. He went away satisfied, but returned on the twentieth day of February, and they then prevailed upon him to take the note in suit as security for the payment of his principal, paying him the interest then due upon his certificates. The circumstances which indicate that he supposed the bank to be insolvent, or in contemplation of insolvency, are that he knew there had been a run upon the bank, and was unwilling to allow his money to remain without security, although the affairs of the bank had apparently resumed their normal condition, and the officers represented the bank to be solvent, and were ready to pay him his deposits if he insisted upon payment.

Insolvency, as ordinarily defined, is that condition of affairs in which a merchant or business man is unable to meet his obligations as they mature in the usual course of his business. *Thompson* v. *Thompson*, 4 Cush. 127; *Vennard* v. *McConnell*, 11 Allen, 555; *Wager* v. *Hall*, 16 Wall. 599. An act of insolvency takes place when this state of affairs is demonstrated and the merchant has actually failed to meet some of his obligations. A bank is in contemplation of insolvency when the fact becomes reasonably apparent to its officers that the concern will presently be unable to meet its obligations, and will be obliged to suspend its ordinary operations. It is not open to fair doubt but that the officers of the bank here contemplated failure as imminent. They doubtlessly hoped to defer the event indefinitely by concealing the real condition of affairs; but they took counsel of their hopes, and not of their judgment, when they contemplated any pro-

longed postponement. The question, then, is whether the transfer was preferential, and made with that view. An intent to give a preference is presumed when a payment is made to a creditor by a debtor who knows his own insolvency, and therefore knows that he cannot pay all his creditors in full. A preference is the natural and probable consequence under such conditions. Here the active and paramount motive on the part of the officers of the bank was to avoid having to pay McGregor his money, and thus to postpone the failure of the bank; but this circumstance does not alter the legal quality of the act. They made the transfer with a view to give him a preference, if, in view of the situation, they supposed it would result in a preference to him, notwithstanding that they were mainly influenced by considerations of self-interest. In the language of SHAW, C. J., in *Denny* v. *Dana*, 2 Cush. 172: "The intent to prefer is essential, but every person is to be presumed to intend the natural and probable consequences of his own acts. It does not rebut this intent to show that the debtor has also another motive to the proceeding, namely, an expectation of pecuniary or other benefit to himself by means of further loans of money, and being enabled thereby to continue his business."

The proofs indicate that McGregor took the transfer with a view of obtaining a preference over the other creditors of the bank. He took it with this view, if he supposed the bank to be insolvent. It was held in *Case* v. *Citizens' Bank*, 2 Woods, 23, in a case arising under this statute, that it is not necessary, in order to invalidate the transfer, that the party to whom it is made knows of or contemplates the insolvency of the bank which makes the transfer. This decision was based upon a decision of Mr. Justice STORY in *Peckham* v. *Burrows*, 3 Story, 544, in which it was held, under the bankrupt act of 1841, that, to constitute a conveyance "in contemplation of bankruptcy," it was not necessary that the creditor should know of the debtor's insolvency, or should co-operate with him to obtain a priority of payment. It is not necessary to adopt the doctrine of *Case* v. *Citizens' Bank* for present purposes, and there are good reasons why it should be adopted with great reluctance. A case may be supposed where a bank is hopelessly insolvent, and is known to be so by its officers, and when any payment made by it will, as they know, necessarily result in a preference to the person receiving it; and yet, if made in the ordinary course of business, as for instance to a customer, who, in ignorance of the condition of the bank, continues his dealings and makes daily deposits, and draws out checks daily, it would be extremely inequitable to compel the latter to pay it back. Under such circumstances the bank or its creditors would receive the benefits of his deposits, while he would be compelled to repay what he had drawn out innocently, and in the usual course of business. It would be a harsh statute which would compel a creditor or depositor, under such circumstances, to yield up the payments he received in good faith. A construction which would give such an effect to this statute ought not to be indulged, in the ab-

sence of clear and explicit language requiring it. But the transaction on the part of McGregor was not an ordinary one. It is extremely unusual for a depositor of a bank to demand security as a condition of allowing his money to remain. Such a demand suggests at once the belief in his mind of the existence of an exceptional state of affairs in a financial institution. A bank ordinarily represents financial *stamina* of the first order. It is trusted, without security, as the safest custodian or debtor that can be selected. Its resources consist of cash, or securities which can readily be converted into money, in order to meet instantly any demands which may be made upon it. Even when it is subjected to the strain of an extraordinary emergency, like a run, it is supposed that a solvent bank will be able to provide itself with funds to carry it safely through. When a depositor asks a bank to give him security for the payment of his deposit, the inference is almost irresistible that he distrusts the solvency of the bank. The only reason why McGregor called for his deposits was because he feared the bank was not safe. He could not be reassured of its solvency by the representations of the officers. He could be satisfied by nothing except the money or adequate security.

Following the decisions under the analogous provisions of the bankrupt act, invalidating preferential transfers by insolvent debtors to creditors, it should be held here that the transaction was one outside of the ordinary course of business, and the circumstances such as to impute to McGregor reasonable cause to believe that the bank was insolvent.

WHEELER, J. To avoid this transfer it must have been made after the commission of an act of insolvency, or in contemplation thereof, and with a view to prevent the application of the assets of the bank to the redemption of its circulating notes and ratable distribution among its creditors, or to the preference of the defendant's intestate to other creditors. Rev. St. §§ 5242, 5236. There is no limitation of time within which the transfer must have been made; nor requirement of reasonable cause of the transferee to believe in the insolvency of the bank; nor provision that the fact that the transaction is out of the usual course of business, should be *prima facie* evidence of fraud, applicable to this transaction, as there was to transfers of a bankrupt's property under the late bankrupt act. Sections 5128, 5129, 5130. Insolvency is not enough; the statute does not make transfers after insolvency void. There must be an act of insolvency; or such a state of insolvency, as an existing fact, as to make it apparent that the creditors cannot be paid in full, and that a distribution of the assets among the creditors under the statute will take place. Less insolvency than this could not fairly be said to be capable of being contemplated and acted upon to prevent such distribution. There had been no act of insolvency at the time of this transfer. The bank had met and satisfied all its creditors up to that time. The case must turn upon the

fact of insolvency and its imminence. That the bank was, in fact, insolvent, appears very clearly. Whether it was so desperately insolvent that the officers could not help seeing that failure must come, and a distribution of assets follow, is to be determined upon the evidence. The reported cases do not furnish any very clear guide for a case like this. In none of them was there any doubt about the fact that all knew that the bank must go down.

In *Bank* v. *Colby*, 21 Wall. 609, the bank was already in the custody of the secretary of the treasury. In *Case* v. *Citizens' Bank*, 2 Woods, 23, a sudden disaster by the failure of others had broken the bank at once, to the knowledge of all; and in *Harvey* v. *Allen*, 16 Blatchf. 29, the circulating notes of the bank had gone to protest, and this fact had been certified, and proceedings to close the bank taken upon it. There was no question, nor room for any, but that those whose acts were in question knew that they were not dealing with the assets of a bank in a continuing business, but with a wreck. Here the bank was doing a large business, which continued for months; its insolvent condition had come upon it gradually, without any striking thing happening to at once command attention, except the run upon it, which showed that its reputation for soundness was affected. When the condition that would avoid preferences once existed, it would avoid all payments in diminution of assets made afterwards as well; and such fact, reaching so far and so many, ought not to be found except upon signal proof, so clear as not to be liable to be found one way as to some to be affected, and in another way as to others, producing inequality where the whole object is equality. Not that current business transactions, which would not affect the volume of assets, are necessarily to be opened; but all applications of the assets, either in reduction or security of existing debts, are placed by the statute upon the same footing of being utterly void.

The officers of this bank were largely interested in it as stockholders and otherwise, and were largely indebted to it personally. The insolvent condition of the bank rested largely upon their own inability to pay what they owed it. They were very anxious to save the bank, and put forth every effort to do so, and hoped to succeed. They transferred the note in question to the defendant's intestate to quiet him, because he insisted upon security, and not because they had any desire to pay him in preference to others. They did this to save the bank, and not to prefer him. This was before thought to be decisive in favor of the validity of the transfer. *Roberts* v. *Hill*, 23 FED. REP. 311. But the available assets of the bank were so small in comparison with its liabilities that, had the officers stopped and considered its situation, they must have seen that ultimate failure was inevitable. Impelled by their interest and desire to save the bank and themselves in standing and credit so long as they could, they bent all their efforts to that end. Still, the hopeless insolvency of the bank was within their contemplation, if they would contemplate it. That they

did not, should not, it seems, take the case out of the statute. The insolvency of the bank was before them, and, with it before them, they gave this creditor a preference. This now appears to be within the statute. I concur, therefore, in the entry of a decree for the plaintiff setting aside the transfer of this note.