## ARMSTRONG v. CHEMICAL NAT. BANK.

*(Circuit Court, S. D. New York. January 4, 1890.)*

1. NATIONAL BANKS—INSOLVENCY—PREFERENCES.
    Rev. St. U. S. § 5242, which prohibits all transfers by any national banking association made after the commission of an act of insolvency, or in contemplation thereof, with a view to the preference of one creditor to another, is directed to a preference, not to the giving of security when a debt is created; and if the transaction be free from fraud in fact, and is intended merely to adequately protect a loan made at the time, the creditor can retain property transferred to secure such a loan until the debt is paid, though the debtor is insolvent, and the creditor has reason at the time to believe that to be the fact.

2. SAME—BANKER'S LIEN.
    A banker's lien for the amount of the balance of its general account does not exist when the securities have been deposited with the bank for a special purpose, or for the payment of a particular loan.

In Equity. Suit to recover balance on account.

*Stephen A. Walker,* for complainant.

*S. P. Nash,* for defendant.

WALLACE, J. June 14, 1887, the Fidelity National Bank of Cincinnati transmitted to the defendant, a bank doing business in the city of New York, securities consisting of notes, drafts, and bills of exchange of the aggregate face value of over $1,000,000. The Fidelity National Bank failed shortly thereafter, and the complainant was appointed its receiver. In the following November the defendant returned some of the securities to the receiver. The receiver now sues to recover the balance. The defendant asserts that it is entitled to retain $612,587 which it collected from the securities, and apply the same to discharge that amount of indebtedness owing to it by the Fidelity National Bank at the time of the failure of the latter, and that it has returned or accounted for the balance of the securities to the plaintiff. The following facts appear in the record: The two banking institutions had, for a considerable period of time anterior to the transactions in controversy, acted as correspondent banks for one another at their respective places of business, during which time the Fidelity Bank also kept with the defendant an ordinary deposit account, which was a large and active one. The accounts between the two banks, arising from collections, deposits, and payments, were adjusted periodically, and any balance existing at such times was credited or debited, and carried forward in the accounts. In March, 1887, the Fidelity Bank sent to the defendant $326,695, face value, of notes and bills, as collateral to a temporary loan which it then asked for of $300,000, and the defendant consented to make the loan, and credited the account of the Fidelity Bank with the amount. The transaction out of which this suit arises, and which originated June 14th, appears by correspondence by telegraph and mail between the two banks. June 14th the Fidelity Bank telegraphed the defendant:

"Parties have been sending false anonymous circulars, and have reported a run on us, also false. We forward to you about one million choice bills to

hold against any overdraft, which will not be to exceed thirty days. Will you protect us?"

On the same day it wrote to the defendant:

"We inclose herewith about $1,000,000 of our choice bills, to hold against any overdraft we may make until the false rumors subside. We trust you will not fail to stand by us, as everything is all right, and we will appreciate the favor in time of necessity."

June 15th the defendant telegraphed the Fidelity Bank:

"On satisfactory bills, when received, might advance $200,000. Amount you name much too large."

The same day the Fidelity Bank wrote to defendant:

"We have your telegram that you will advance $200,000 on satisfactory bills. The demand on us to-day is fearful, but we can recover by your help during the week. The million dollars of bills are choice, and beg of you to stand by us to a large amount, if we require it, which we will for a few days. We have been keeping an active account with you, and have no other bank to ask favors of. If you will do as we request, it will be one of the best acts of your history, and be appreciated more than words can express. There is no bank that we know of that can pay all at one time, without help, and we beg of you to see us through, especially as you run no risk, as these bills receivable are all good beyond question. The panic is subsiding, and we think in one week will be a thing of the past."

The same day the Fidelity Bank telegraphed the defendant:

"Charge us and deposit with assistant treasurer, New York, one hundred thousand dollars. Have him wire at once assistant treasurer here to pay us one hundred thousand dollars currency."

June 17th defendant telegraphed to Fidelity Bank:

"We wrote you yesterday that we expected to be liberal, and may increase the amount somewhat. Telegraph us authorizing us to discount any of the notes, and pledging all notes and security in our hands for any indebtedness to us, and confirm by letter."

The same day the Fidelity Bank telegraphed to defendant:

"If you will discount five hundred thousand dollars of the bills, and return balance, it will be sufficient. Wire at once."

The same day the defendant telegraphed to the Fidelity Bank:

"We think it would be enough if we discount $650,000 of the bills, and then charge up the certificate of deposit for $300,000, retaining a margin of collaterals, and returning the rest."

The same day the Fidelity Bank telegraphed defendant:

"Please refuse payment on our four drafts, Nos. 16,411 to 16,414, inclusive, for one hundred thousand dollars each."

June 18th the Fidelity Bank telegraphed to defendant:

"Please discount eight hundred thousand dollars of the bills, and then charge up certificate of deposit for three hundred thousand dollars; retain a margin of collaterals, and return us balance. If this is done, we pledge all notes and securities in your hands for any indebtedness to you."

The same day the defendant telegraphed Fidelity Bank:

"Attachments just served, suit Bank of Montreal on your account, and all your property here; two hundred thousand dollars amount of suit."

The same day the defendant telegraphed to the Fidelity Bank:
"Make no remittances to Chemical, and do not draw on it."

The same day the defendant wrote to the Fidelity Bank:
"Your telegram of this date has been received, 'Please discount $800,000,' etc., and while framing a reply in which we intended to say that we would make it $700,000 total indebtedness, not $800,000,—which we considered too large,— at 11:45 A. M. the warrant of attachment which is inclosed herewith for your perusal and return by return mail was served on us, thus putting a check upon any further loans to you or essential change in the ac. We then telegraphed you of this attachment, and shortly thereafter wired you by West. Union, and then by B. & O., not to send any remittances, and not to draw on us. You will, of course, see the wisdom of this request; for whatever you sent us would be subject to this attachment, if we accept such remittances. Would it not be well also to have any orders which you may have given to your correspondents to remit to us for your account canceled? . We send you statement of act. showing you overdrawn $113,049.99. Our collections act. appears about $34,000 in your hands in addition thereto."

June 18th the Fidelity Bank wrote to defendant:
"We to-day drew small checks, amounting to about $5,800, before we received your message. We trust you have sufficient security to protect the $200,000 attachments, and pay the checks of to-day, and leave a small surplus addition, which you can no doubt help us on. We think we are over the worst, and if our friends stand by us everything will work in good shape soon. We thank you for your favors, which are greatly appreciated."

June 19th Fidelity Bank telegraphed defendant:
"Will you protect our outstanding drafts on you with proceeds in our letter of the 7th, (remittances for collection and credit,) which will more than cover? If not, deliver to First National Bank, and we will instruct them to protect. Wire at once."

June 20th defendant wrote to Fidelity Bank:
"Your telegram of the 19th inst has been received, asking if we would protect your outstanding drafts against yours of 17th. We wired back that we have paid your drafts. We have not refused payment of any of your drafts excepting the four of $100,000, stopped by you. Herewith statement of your act., showing you overdrawn $89,020 at close of business to-day; also you owe us, for collections, $34,340.29."

By a stipulation between the parties, it appears that the Fidelity Bank "was insolvent on the 14th day of June, 1887, but that the defendant had no knowledge or reasonable ground of apprehension that such was the fact." The Fidelity Bank closed its doors June 21, 1887, and the complainant was appointed its receiver, June 27, 1887.

Upon these facts the complainant insists that the defendant did not acquire any title to the securities sent to it June 14th, because the transfer was void by section 5242, Rev. St. U. S., which prohibits all transfers by any national banking association made after the commission of an act of insolvency, or in contemplation thereof, with a view to the preference of one creditor to another. On the other hand, the defendant in-

sists that it acquired a banker's lien upon the securities for the amount of any balance upon its general account with the Fidelity Bank which remains unpaid.

The naked fact that the Fidelity Bank was insolvent at the time it sent the securities to the defendant does not imply that the transfer of the securities was made in contemplation of insolvency, or with a view of a preference to the defendant over its other creditors. Although, in the light of subsequent events, the Fidelity Bank was then insolvent, it may be that its insolvency was not suspected by its officers. So far as appears, no act of insolvency had been committed. A bank is not in contemplation of insolvency until the fact becomes reasonably apparent to its officers that it will presently be unable to meet its obligations, and will be obliged to suspend its ordinary operations. *Roberts* v. *Hill*, 24 Fed. Rep. 571. Until this condition of affairs exists, certainly a national banking association does not violate the statute by pledging its securities to a reasonable amount to raise money needed to meet an unexpected run. The best-managed institutions are liable to such contingencies, and the right to use their assets in an honest attempt to bridge over such a crisis is indispensable to their safety. Obviously, the exercise of this right would be impracticable if the pledge becomes void whenever the attempt of the bank to rescue itself from failure proves unsuccessful. It is apparent that the Fidelity Bank did not intend to pledge the securities as collateral to its antecedent indebtedness when it sent them in June to the defendant, or for any purpose other than to the advances which it then desired. They were sent to protect the defendant against a temporary loan, not of any specific sum, but of such sums as the Fidelity Bank might need to meet the exigencies of the situation; against overdrafts not warranted by the state of its account with the defendant, and which it expected to be compelled to make immediately. The defendant understood this, but was unwilling to accede to a loan of an indefinite amount, and offered at first to advance $200,000. The Fidelity Bank was not satisfied with this proposition, and begged the defendant to "stand by" to a larger amount, if its necessities so required. The letter of the defendant of June 17th does not imply any understanding on its part that it was to hold the securities to protect the former loan, much less the general account of the Fidelity Bank. That letter mentions the fact of the previous loan of $300,000 apparently as a suggestion of the extent of the assistance already rendered, and its disposition to treat the Fidelity Bank with liberality. That the defendant did not suppose the securities were in its hands as collateral for anything except the sums needed by the Fidelity Bank for the emergency, is apparent from its letter of June 17th, asking the Fidelity Bank to pledge them for all indebtedness. To this the counter-proposition of the Fidelity Bank was that it would accede if the defendant would discount $500,000 of the securities and return the rest. Up to this time there had been no thought expressed on the part of either bank that the securities were to be a collateral for the general indebtedness of the Fidelity Bank. In the mean time the defendant had advanced $200,000 by depositing it for the Fidelity Bank

with the assistant treasurer at New York city, and the Fidelity Bank had telegraphed for $100,000 more; and thereupon, answering the last proposition of the Fidelity Bank, the defendant proposed to discount $650,-000 of the securities, and return the rest, doubtless meaning to apply the proceeds to its $300,000 loan of March, and to its advances made after June 14th, retaining the excess as a margin to make good these amounts in case any of the discounted paper should not be paid. To this proposition the Fidelity Bank replied that if the defendant would discount $800,000 of its securities it might charge up the $300,000, return the balance, and retain a margin of collateral,—that is, the proceeds of the $800,000 discounted paper,—and in that event all retained in its hands should stand as collateral for its whole indebtedness. At that time its whole indebtedness, as appears from the defendant's letter of June 18th, was $300,000, $200,000, $113,000, and $34,000, in all, $647,000, and the Fidelity Bank doubtless supposed that the discount of $800,000 of securities would cover its whole indebtedness, and enable it to draw further until there should be left only a sufficient margin to provide for the non-payment of any of the discounted paper. Before this proposition on the part of the Fidelity Bank was assented to by the defendant, the attachment was served at the suit of the Bank of Montreal, and the negotiations were closed. When the negotiations were thus terminated, the Fidelity Bank had not consented that the securities should stand as collateral for the March loan of $300,000, or for its general indebtedness to the defendant. At this time the defendant had advanced the Fidelity Bank $200,000 on the faith of the securities, and had written that it expected to be liberal, and might increase the amount. It is not quite clear whether the defendant had not also permitted the Fidelity Bank to overdraw its account in the further sum of $113,000, (subsequently reduced to $89,000.) Under the circumstances, any overdraft made after the securities were sent to the defendant, and after it had advanced the $200,000, should be regarded as one allowed on the faith of the securities, in the absence of distinct evidence to the contrary. If any part of the $89,000 was a previous overdraft, to that extent it is not to be included. In this connection it is proper to say that the amount of an overdraft is not necessarily the sum drawn, but is the amount drawn, less the amount to which the drawer at the time is entitled to a credit balance upon his account.

If there was no transfer of the securities to protect the antecedent indebtedness of the Fidelity Bank, then there was not a preference of the defendant over its other creditors, and consequently there is nothing in the transaction which contravenes the provisions of the statute. Although the securities sent were of a value vastly in excess of the sum advanced upon them, they were sent upon the expectation by the Fidelity Bank of obtaining advances to the limit for which they would be acceptable collaterals; and before there was any suggestion of pledging them for pre-existing indebtedness the defendant had acquired a valid lien upon them by the advances already made, and the Fidelity Bank was unable to recall them if it had desired to do so. The statute is directed to a prefer-

ence, not to the giving of security when a debt is created; and if the transaction be free from fraud in fact, and is intended merely to adequately protect a loan made at the time, the creditor can retain property transferred to secure such loan until the debt is paid, even though the debtor is insolvent, and the creditor has reason at the time to believe that to be the fact. This has often been decided in the analogous cases arising under the bankrupt act, (*Tiffany* v. *Lucas*, 15 Wall. 410; *Cook* v. *Tullis*, 18 Wall. 332; *Clark* v. *Iselin*, 21 Wall. 360,) and has been expressly held in a case arising under the present statute, (*Casey* v. *Societe de Credit Mobilier*, 2 Woods, 77.)

The view thus reached is necessarily fatal to the contention of the defendant that it acquired a lien securing it for the $300,000 loan, or for the payment of the balance arising upon the general account of the Fidelity Bank. It is familiar law that a banker has a lien upon all funds and securities in his possession, deposited with him in the usual course of business by a customer to facilitate the financial transactions contemplated between them, which extends to the payment of any balance on general account. The lien arises from the implied understanding of the parties that credit is to be given in the course of dealings between them by the banker to the customer upon the faith of the securities. It is equally familiar law that the lien does not exist when the securities have been deposited for a special purpose, or for the payment of a particular loan; and, where they are delivered specifically to protect the banker in a particular transaction or series of transactions, he has no lien upon them for any other purpose, and cannot assert one for any other indebtedness, whether arising upon general account or otherwise. This doctrine has very recently been reiterated and applied by the supreme court in *Reynes* v. *Dumont*, 130 U. S. 354, 9 Sup. Ct. Rep. 486. That was a case in which securities, consisting of $275,000 of municipal bonds, had been left by one banking firm with another for a period of two years and a half, during which large transactions on general account took place between them, various loans were made to the former by the latter upon an express pledge of the bonds, and the former, at the request of the latter, had also obtained various loans of other bankers by pledging so many of the bonds as was necessary in the particular transaction. The court found as a fact that the bonds were left with the banking firm originally as collateral for a particular loan; that there was no express understanding between the two banking firms that they were to stand as a security for general transactions, and that the loans subsequently made upon them were specific loans accompanied by an express pledge; and held that these circumstances were inconsistent with the existence of a general lien. If the sending of the securities had resulted, either in consequence of a subsequent express contract, or in consequence of any implication from the nature of the transaction, in giving the defendant a lien for the antecedent indebtedness of the Fidelity Bank, it is extremely doubtful whether the transaction could be upheld. The cases of *Bank* v. *Colby*, 21 Wall. 609, and *Bank* v. *Butler*, 129 U. S. 223, 9 Sup. Ct. Rep. 281, take a view of the statute which suggests that no preference can be obtained

by one creditor of a national bank over another, after the bank has become insolvent, whether obtained with the consent of or by adversary proceedings against the bank, and whether the creditor has or has not any reason to suppose the bank to be insolvent at the time. The complainant is entitled to a decree, and the defendant must account for all the securities which it has not returned to the complainant, their value or proceeds, less the amount of advances and overdrafts made after it received them.