STAPYLTON v. STOCKTON et al.

(Circuit Court of Appeals, Fifth Circuit.    January 3, 1899.)

No. 761.

1. NATIONAL BANKS—TRANSFERS OF PROPERTY WHEN INSOLVENT—VALIDITY.
    Rev. St. § 5242, making void any transfer of property or payment of money by a national bank when insolvent or in contemplation of insolvency, with a view to prefer a creditor or to prevent the application of its assets in the manner prescribed by the statute, has reference to the payment or securing of existing debts, and does not render invalid transfers by way of security for a loan then obtained, and of which all creditors presumptively receive the benefit, although, as a part of the same transaction, it is agreed that the security given shall also stand as security for an antecedent indebtedness to the person making the loan.    While such agreement is invalid, if the creditor acts in good faith, and in the belief that the bank is solvent, it does not deprive him of the right to the security, to the extent of his present advances.

2. SAME—INVALID CONVEYANCE AS SECURITY—EQUITABLE MORTGAGE.

The president of a national bank, who owned a majority of its stock, and exercised full control of its affairs, with the acquiescence of the directors obtained a loan for the bank at a time when it was in fact insolvent, though it was not known or believed to be so by the lender. As security the president executed a deed to the bank building and lot; producing what purported to be a certified copy of the minutes of the action of the board of directors authorizing the conveyance, though no such action had in fact been taken. *Held* that, it being consistent with the course of decision in the state, the deed, though insufficient as a legal conveyance by the bank, would be upheld as an equitable mortgage.

3. SAME—DELAY IN RECORDING MORTGAGE.

The fact that such deed was not recorded until the day the bank closed its doors did not entitle the general creditors of the bank to have it set aside, where there was no agreement to withhold it from record, and, under the laws of the state, it was good as a mortgage, as between the parties, though not recorded.

Appeal from the Circuit Court of the United States for the Southern District of Florida.

F. P. Fleming and F. P. Fleming, Jr., for appellant.

C. D. Rinehart and W. H. Baker, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and PARLANGE, District Judge.

McCORMICK, Circuit Judge. In the opening of the brief of counsel for the appellees there is a statement of this case, which, on examination, we have found to be correct and admirable. It is as follows: This is a suit brought by the receiver of the Merchants' National Bank of Ocala, an insolvent national bank, to have vacated and set aside certain transfers of real and personal property made by the Ocala bank before the bank went into the hands of the receiver, upon the ground that these transfers were made by the Ocala bank contrary to the provisions of section 5242 of the Revised Statutes. The facts out of which this controversy arose may be briefly stated as follows: The defendant Clarence B. Collins was in 1896 state treasurer of Florida, and had a large amount of state funds deposited with the Ocala bank, estimated at about $42,000. About October 18th of that year, R. B. McConnell, who was president of the Ocala bank, notified Collins that the bank would have to have more money, or suspend. Collins telegraphed the defendant Stockton, who was president of the National Bank of the State of Florida, of Jacksonville, Fla., to meet him and McConnell at Jacksonville (Stockton's home). On the 18th they met at Stockton's house. The situation was discussed, and Stockton, on behalf of his bank, refused to advance McConnell or the Ocala bank any money. McConnell then made a statement of the financial condition of his bank, which statement was accepted as true by the others. This statement was that the Ocala bank owed $95,000 to depositors, of which $42,000 was due to Collins, leaving $53,000 due to others, and of this about $30,000 was under his personal control, in one way or another, and would not be drawn; that he had $12,000 in cash assets, and only owed $20,000 in bills payable, which were amply secured; that the assets of the bank were double the amount of all of its liabilities. The reason assigned by McConnell for the condition of the bank was

the general financial depression, the uncertainty attending the approaching presidential election, the difficulty in making collections, and the spreading of malicious and false reports about him and the bank by persons maliciously disposed towards him and his bank. Finally an agreement was entered into between Collins and McConnell, acting on behalf of the Ocala bank. Collins agreed to advance to the Ocala bank $15,000, through Stockton and the Jacksonville bank; and McConnell, for the Ocala bank, was to execute notes to the Jacksonville bank for this sum. The Ocala bank was to transfer to Stockton and the Jacksonville bank, and did so transfer, certain security. These securities were of three classes: (1) Bills receivable, and other like collateral; (2) the equity of the Ocala bank in certain collateral already hypothecated with the National City Bank of New York City; and (3) the city lot in Ocala upon which the bank building of the Ocala bank was located. This lot was conveyed by warranty deed to John N. C. Stockton, the deed being absolute on its face. The indebtedness secured may in like manner be divided into three classes: (1) The $15,000 advanced on or about October 18, 1896; (2) a note for $22,000 given to represent that much of the deposit of $42,000 heretofore mentioned; (3) whatever balance in open account there might be then due Collins. At the time these transactions were entered into, Stockton and Collins believed the Ocala bank to be solvent, although the after developments tended to show that McConnell must have known that the bank was insolvent. The testimony introduced by the complainant (appellant here) through the witness Redding, showing that McConnell kept for the bank two sets of books; one set being the usual set kept by the bank, and the other set, known as the "Reconcilement Book," for the private information of himself. In this reconcilement book he kept the items that from time to time should have been charged to his bank's account with its correspondents, and items that should have been credited to his correspondents. In the statements of the condition of the Ocala bank made to Stockton and Collins, McConnell did not take his figures from his reconcilement book, but gave a set of figures at that time useful to his purpose. Fifteen thousand dollars, on the faith of these collaterals, was loaned to the Ocala bank by Collins, and received by that bank. Afterwards, on January 14, 1897, the Ocala bank closed its doors, and subsequently the complainant was appointed by the comptroller of the currency its receiver. The deed to the bank building and lot was recorded January 14, 1897; an effort having been made on the 13th to have the deed recorded. There was no agreement between the parties not to record the deed, or to withhold it from record. The deed of conveyance was executed by McConnell as president of the Ocala bank, under what purported to be a certified copy from the minutes of the board of directors. The defendants when they parted with their money relied upon this resolution as being true and worthy of full confidence. The complainant proved that no such resolution appeared upon the minute book of the bank, and, by the testimony of several directors, that no such resolution had ever been passed. McConnell had committed suicide in the time between the failure of the Ocala bank and the filing of the bill in this case. The testimony of all the directors examined showed that Mc-

Connell was the owner of a controlling interest in the bank, and that the management of its affairs was exclusively under his immediate control. The directors knew nothing of the business of the bank. No meetings of directors were ever held, except at long intervals; and then such meetings were only formal, and simply ratified such action of the president as he deemed advisable, and passed such resolutions as he wished passed. By consent and stipulation of the parties to the suit, while the bill was pending, and before final decree, the real estate was sold, and the amount of the purchase price, $8,000, was deposited in the registry of the court. This stipulation provided that all questions concerning the ownership and disposition of the money should be settled in this suit. Some moneys ($1,949.23) were, under a similar stipulation, deposited in the registry of the court, which moneys arose out of collections made out of the equity in the collateral hypothecated with the National City Bank of New York City. The cause coming on to be heard on final hearing, the lower court adjudged (1) that the attempt to secure the $22,000 note and open account were void; (2) that the defendants were entitled to the benefit of all the security, including the mortgage on the bank building and lot (then represented by deposit in the registry), until the full sum of $15,000, with interest, had been paid, including in such payment all dividends; (3) that an accounting of the collateral held by the defendants should be had. By this decree the complainant felt aggrieved, and appealed to this court, and assigns as error the entry of such final decree, and more specifically the allowing of any lien upon either of the three classes of security for the payment of the notes for $15,000.

The assignment of errors, with 11 specifications, presents two questions: (1) Was it competent for the bank to secure the $15,000 advanced by Collins at the time the security was given? (2) Was the security attempted to be given on the real property sufficient to bind the receiver? The circuit court answered both of these questions in the affirmative. The receiver insists that this ruling was erroneous, and, with regard to the first question, founds his contention on section 5242 of the Revised Statutes, which reads as follows:

"All transfers of the notes, bonds, bills-of-exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in a manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void. * * *"

It could hardly be contended by counsel for the appellees that at the time this advance was made to the bank the president had any reasonable expectation of being able to extricate it from its difficulties. And if, in charity, we should concede that he had persuaded himself to believe that this advance would enable him to regain and maintain the credit of his bank, he must, as Judge Wallace said in Roberts v. Hill, 24 Fed. 571, have taken counsel of his hopes, and not of his judgment. It being thus reasonably apparent to the officers of the bank that it

must presently be unable to meet its obligations, it will be conceded that the bank was legally in contemplation of insolvency when this advance of $15,000 was made to it by Collins.    The proof, we think, shows that Collins and Stockton relied on the representations made by the president of the bank, and in good faith acted thereon.    Those representations, if they had been true, were reasonably sufficient to justify the belief on the part of Collins and Stockton that the bank, though temporarily in difficulty, was in fact solvent, and, with the aid asked, might overcome its embarrassments.    In such circumstances it was not unlawful for the bank to seek, or for others to extend, help.    It would indeed be difficult for a bank ever to borrow money, if the mere fact that it needed to borrow money put all who were able and willing to aid it upon notice that it was in contemplation of insolvency, in such a sense and to such an extent as to deprive it of capacity to bind itself, and them of capacity to take security from it.    There is certainly nothing in the statute to support this view.    It forbids the transfer of securities made with a view to prevent the application of its assets in the manner prescribed by law, or with a view to the preference of one creditor to another, with a named exception.    As to this $15,000 advance, it cannot reasonably be said that it gave Collins any preference, or that it was made with a view to obtain for him a preference in reference to it.    He paid out the money.    It went into the bank.    Not a dollar of it, so far as the record shows, went to any preferred creditor. It was used, and doubtless all used up, in the regular operations of the bank.    For this advance he took security, which at the time did not appear to be, and which is proved not to have been, excessive,—certainly not beyond that reasonable margin of surplus which safe investments require.    As a part of this transaction, it was provided that this reasonable amount of surplus in the security should be held by the party making the desired and necessary advance as security for an antecedent debt due from the bank to him.    This part of the transaction did violate the statute, and was void.    The appellant contends that, being void as to this part, it cannot be held good as to the advance at that time received by the bank.    He supports his contention with this extract from the opinion of Judge Wallace in Armstrong v. Bank, 41 Fed. 234:

"If the sending of the securities had resulted, either in consequence of a subsequent express contract, or in consequence of any implication from the nature of the transaction, in giving the defendant a lien for the antecedent indebtedness of the Fidelity Bank, it is extremely doubtful whether the transaction could be upheld.    The cases of Bank v. Colby, 21 Wall. 609, and Bank v. Butler, 129 U. S. 223, 9 Sup. Ct. 281, take a view of the statute which suggests that no preference can be obtained by one creditor of a national bank over another, after the bank has become insolvent, whether obtained with the consent of, or by adversary proceedings against, the bank, and whether the creditor has or has not any reason to suppose the bank to be insolvent at the time."

In the same opinion we find this language:

"The statute is directed to a preference, not to the giving of security when a debt is created; and if the transaction be free from fraud in fact, and is intended merely to adequately protect a loan made at the time, the creditor can retain property transferred to secure such loan until the debt is paid, even

though the debtor is insolvent, and the creditor has reason at the time to believe that to be the fact."

We have carefully examined the cases of Bank v. Colby and Bank v. Butler, supra, and find that they both relate wholly to antecedent debts. And, as we construe these cases and the case of Armstrong v. Bank, they do not support the contention of the appellant in this case, and are not inconsistent with the ruling of the circuit court. There is no question in this case as to the lien in favor of the United States on all the securities of the bank to protect its circulation. The question is one wholly between other creditors. And it appears to us inequitable to hold that other creditors, who must be presumed to have received their due advantage from the advance of the $15,000 made by Collins, should be suffered to keep that advantage, and to require him to surrender security which he in good faith took at the time he made the advance.

As to the second contention of the appellant, we think the deed given by the president of the bank must be held to be good as a pledge for the repayment of the money received thereon at the time the pledge was given. There is nothing in the statutes of the United States which forbids this transfer being made in the manner that it was made, if the directors of the bank had in fact authorized it. There was nothing in the transaction, therefore, to charge Collins with notice that the president was not authorized to convey the real estate, or that the president was not authorized to certify to a resolution purporting to be taken from the minutes of the proceedings of the board of directors. It is manifest that the design of the parties was that the deed should serve as security for the repayment of the money. On this, in part, the money was advanced. And even though the deed be wanting in full, formal execution as an act of the bank, the general authority of a president, and the general relation of this president to the bank, and all the circumstances and conditions under which the deed was given, we think, are sufficient to sustain it as an equitable mortgage, under the statutes and decisions of the state of Florida. Margarum v. Orange Co., 37 Fla. 165, 19 South. 637. The deed to the bank building and lot was recorded the same day the bank closed. An effort had been made on the previous day to have the deed recorded. There was no agreement between the parties not to record the deed, or to withhold it from record for any time. As between the parties, the deed, if otherwise good as a mortgage, was good, without reference to whether it was recorded or not. Rogers v. Munnerlyn, 36 Fla. 591, 18 South. 669. We think it would be going very far to hold that, under these circumstances and conditions, the general creditors obtained by force of the United States statutes a lien on this property before the filing of the deed for record. At the most, there is nothing to show priority in favor of either, as the failure of the bank and the filing of the mortgage for record were cotemporaneous. We conclude that the decree of the circuit court appealed from should be, and it therefore is, affirmed.