## BROWNE v. STRONACH.

(District Court, D. Montana, Great Falls Division. March 25, 1925.)

### No. 15.

**1. Banks and banking ⟨⟩286—Transfer by insolvent national bank held void as preference.**

The transfer by a national bank when insolvent and within a few days before it closed its doors, its condition not having materially changed in the meantime of substantially all of the unincumbered lands owned by it, in consideration of the surrender of claims of the grantor against it consisting chiefly of certificates of deposit, *held* void as intended to prefer the grantor to other creditors, in violation of Rev. St. § 5242 (Comp. St. § 9834).

**2. Banks and banking ⟨⟩285—Bank is in "contemplation of insolvency," when approaching inability to meet obligations reasonably apparent.**

A bank is said to be in "contemplation of insolvency," when the fact becomes reasonably apparent to its officers that it will presently be unable to meet its obligations and will be obliged to suspend its ordinary operations.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contemplation of Insolvency.]

**3. Banks and banking ⟨⟩286—Intent to give preference presumed from payment by insolvent bank.**

An intent to give a preference is presumed when a payment is made to a creditor by a bank which knows its own insolvency and therefor knows that it cannot pay all its creditors in full.

**4. Banks and banking ⟨⟩286—Transfers void under statute.**

Rev. St. § 5242 (Comp. St. § 9834), which makes void, inter alia, all transfers by a national bank in contemplation of insolvency made with a view to the preference of one

creditor to another, of "mortgages, sureties, on real estate, or of judgments or decrees in its favor," applies to a transfer of lands which the bank acquired through decrees foreclosing mortgages.

**5. Banks and banking ⟨⟩286—Statute should be construed to effect its purpose.**

The purpose of such statute is to secure equality of distribution among its creditors of the assets of an insolvent bank, and, where necessary to effect such purpose, it should be construed to apply to a case which is within its spirit, though not within its literal language.

**6. Banks and banking ⟨⟩286—Payments made in due course by insolvent bank not void as preferences.**

Payments made by a bank to a depositor from his checking account, in due course of business, cannot be regarded as having been made or received with a view of giving a preference to such depositor over other creditors, though its officers knew of the bank's insolvency.

In Equity. Suit by Frank Browne, as receiver of the First National Bank of Chester, against Mary A. Stronach. Decree for complainant.

Max P. Kuhr, of Havre, Mont., for complainant.

Norris, Hurd & Rhoades, of Great Falls, Mont., for defendant.

PRAY, District Judge. This suit was brought under section 5242 of the Revised Statutes of the United States (section 9834, Comp. St.), the effect of which is to declare null and void transfers made by a national bank "after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes." The language of this section discloses the intention of enforcing the principle of equality among the creditors of an insolvent bank.

The plaintiff, as receiver of the First National Bank of Chester, is seeking to set aside certain conveyances of real estate, the property of the bank, and executed by the bank to the defendant, and alleged to have been made in violation of the above statute. The bank was organized in 1917 with a capital stock of $25,000, and closed its doors July 18, 1923; otherwise stated, it failed to open for business July 19, 1923. The receiver was appointed July 30, 1923, and directly thereafter took charge of the bank. At the time the bank closed, J. O. Berglin was the president and principal owner, having 225 shares of the capital stock.

[1] The transfers in question embrace 2,680 acres of grazing and agricultural lands owned by the bank, and situated in different localities in Hill and Liberty counties, Mont., the greater part, having been held by the bank as security for loans and later acquired under foreclosure proceedings. The land was conveyed by four warranty deeds, all dated July 3, 1923, consideration $1, and all were signed by J. O. Berglin as president, F. A. Pike as cashier, and acknowledged before Miss E. E. Carlile, assistant cashier, as notary public. All of the deeds were filed for record after the bank closed; those conveying land in Liberty county, the county in which the bank was situated, were filed for record July 19, 1923, and the fourth deed conveying land in Hill county, was filed July 21, 1923. Prior to giving the deeds, the bank owed the defendant $17,000 evidenced by certificates of deposit, savings accounts, and checking account. When the land was conveyed to defendant, her account at the bank was debited as follows: Savings account of Mary A. Stronach, the defendant, $5.17; savings account of Edith Stronach, her daughter, $1,443.63; certificates of deposit, in name of defendant $15,-551.20—in all $17,000. There were five of these certificates of deposit and in the following respective amounts: $5,775.60, $5,-775.60, $1,000, $2,000, and $1,000. They are referred to as the old certificates, to distinguish them from the new or later certificates of deposit for like amounts dated July 12, 1923, and which were in effect renewals of the old certificates.

The evidence shows that the receiver, at the time of taking possession of the bank, made an examination of its condition and prepared a report covering the assets and liabilities as of the date of closing. He made an estimate of the value of the assets of the bank after personal investigation and inquiry, and found them, as disclosed by its books, the same in kind and value on July 3, 1923, as on July 19, 1923, with the exception of the real estate account. The bank officers placed a value of $6.35 per acre on the land conveyed to defendant; in his report the receiver used about the same basis for his valuation—that is to say, about $6 per acre for other real estate holdings. The land involved in this suit is of about the same value as the remaining lands and real estate securities held by the bank. The customers of the bank were chiefly engaged in the farming and live stock industry, and nearly all of the bank's resources consisted of live stock and farm land securities. Prior to July 3, 1923, it appears to have been evident that there would be a crop failure for that season in that locality. Several crop failures had occurred there immediately preceding the year 1923.

The testimony of the president of the bank does not alter materially the estimate of values made by the receiver. According to the receiver's report: The total liabilities of the bank at the time of closing, not including capital stock and surplus, were $230,000. The total assets, at the same time, had a face value of $266,000, which, according to the receiver, represented "a fair and reasonable actual value" of $66,117.36, leaving a deficit at the time of closing of $165,000. That there was practically no change in the condition of the bank between July 3 and July 19, 1923, except the change aforesaid. That at the time of closing only a small portion of the assets remained in possession of the bank; such remaining assets having a book value of $25,082.23. The receiver stated that the fair and reasonable value of such assets was $7,385.75; that all of the assets of the bank, except the foregoing, had been pledged to various creditors and according to the books the bank had an apparent equity of $60,000 in such pledged assets. It appears from the evidence that the assets will not pay the debts they were given to secure. On and prior to July 3, 1923, the bank owned real estate which it carried on its books as an asset of the bank at a valuation of $39,-665.25; included therein was the land involved in this suit, unincumbered, consisting of 2,680 acres, and 3,600 acres of other grazing and farm lands, all subject to liens and incumbrances, and also town lots valued at about $1,000. When the conveyances were made to defendant, the real estate account was reduced in the sum of $17,000, and thereafter carried on the books of the bank at $22,665.25. Aside from the amounts heretofore mentioned as due defendant and her daughter, aggregating the sum of $17,000, it appears that on July 12, 1923, the bank paid to Edith Stronach $500 from her savings account, and on July 18th, the last day the bank was open, she drew $49.50 from her checking account, and further the bank books show that defendant's savings account was debited $981.83 and her checking account $640.19, on July 18, 1923; these sums being no part of the consideration for conveyance of the real estate. When the bank closed its doors, it owed nothing to the defendant or her daughter.

The defendant's witnesses testified that the deeds were executed and delivered on July 3, 1923. The bank record shows a meeting of the directors on that date, irregularly inserted in the book by pasting on the bottom of the page showing the minutes of May 19th, authorizing the sale of 2,680 acres of unincumbered land of the bank to defendant. From the testimony and exhibits, it appears that the accounts of defendant and daughter in the respective sums of $5.17 and $1,443.63 were debited not earlier than July 12, 1923; these items were a part of the $17,000 consideration for the land. The old certificates of deposit were not charged on the books against the defendant until about July 16, 1923. In a book called the "draft" book were entered certificates of deposit issued and paid. On July 16, 1923, there appears on the issued side of this book a total item of $200 paid to one Edith Philipin. The journal also shows the same item. From both of these books it appears that there was no other $200 item paid for the month of July, 1923. On the page of the draft book showing certificates of deposit paid during the month of July, 1923, erasures had been made. On one line which was partly erased was entered the item of $200, paid to Edith Philipin, which on the issued side of the draft book and also in the journal is shown to have been paid on July 16, 1923. On this particular line, and over the erasure, there was inserted, "July 12th 1923 Mary A. Stronach $5,575.60," and on the four next succeeding lines appear the entries of the remaining four old certificates which had been issued to defendant under date of June 17, 1922. That these certificates of deposit were not charged on the books of the bank until July 16, 1923, further appears from the daily statement book in which were found erasures for each day from July 16th back to July 12th. The bank officials testified that these changes and erasures in the books, and irregularities, were errors or mistakes, but in most instances claimed to have no distinct recollection on the subject. The president and a director testified that the transfer or sale of real estate, belonging to the bank, to defendant, had been discussed in January, 1923, following a request from a bank examiner that the real estate account of the bank be reduced. The president denied that the conveyances to defendant were made in contemplation of insolvency or with the intent to prefer one creditor to another. The old certificates were never found, and the officials did not know what had become of

them. The new certificates, with the signatures torn off, are in possession of receiver; these certificates were dated July 12, 1923, and the explanation given by the president for their issuance was that they had been taken from his desk and written up by mistake.

All of these erasures and irregularities had to do with an important transaction during a crisis in the bank's affairs, and some of them occurred only a day or two before the bank closed its doors and ceased to function as a going concern, and, in view of the circumstances, it would be expected that the officials of the bank would be able to give a better account of these occurrences than appears from the transcript. It seems quite certain that the business transactions of this bank at this particular time were not so extensive or complicated as to cause the three persons there employed to forget almost entirely so many of the facts relating to the conveyance of all of the unincumbered real estate of the bank, comprising its only available assets—except the cash, which was almost entirely withdrawn by defendant and her daughter, and except the other assets heretofore mentioned and valued by the receiver at $7,385.75. The new certificates were dated the 12th of July, 1923, and therefore it seems probable that on that date, or subsequent thereto, the plan was adopted to transfer all the unincumbered real estate to defendant, and thereupon such new certificates were canceled and the signatures torn out. The irregularities and erasures in the books of the bank which were exhibited for examination at the trial point to this conclusion.

[2, 3] It is not possible to look into the mind of the former president of the bank and determine with what intent he acted; he said that the transfers were not made in contemplation of insolvency, nor to prefer this creditor over others, but the circumstances do not seem to corroborate his statement. It probably cannot be said that the bank had committed an act of insolvency, but do not the surrounding circumstances, as appear from the testimony of the receiver and the exhibits in the case, furnish convincing proof of the transaction, and show a purpose on the part of the witness Berglin to prefer the defendant over other creditors at a time when he must have known the bank could not survive many more days? The evidence of the receiver is that the bank, at the time the transfers are shown to have been made, was actually insolvent, and there-

fore would have been obliged to close its doors whenever the demands of one or more creditors exceeded 'the depleted cash resources of the bank. The facts show that the situation was critical. "A bank is [said to be] in contemplation, of insolvency when the fact becomes reasonably apparent to its officers that the concern will presently be unable to meet its obligations, and will be obliged to suspend its .ordinary operations. * * * An intent to give a preference is presumed when a payment is made to a creditor by a debtor who knows his own insolvency, and therefore knows that he can not pay all his creditors in full. * * * The intent to prefer is essential, but every person is to be presumed to intend the natural and probable consequences of his own acts." Roberts, Receiver v. Hill, Adm'r (C. C.) 24 F. 574.

[4] Defendant contends that the statute under which this action is brought does not apply. The statute includes assignment of mortgage, judgment or decree of court. Nearly all of the land holdings of the bank seem to have been acquired under foreclosure proceedings. May it be said that a decree of court to this bank in such cases shall come within the purview of the statute, and that the land itself coming to the bank under such decree, sale, and deed from the sheriff is to be excluded from the intendment of the act. That is a narrow construction, and, if we adopt it, it would also follow that a bank officer in collusion with a customer could turn over to such customer all the realty holdings of the bank, no matter how valuable or what proportion of the assets such holdings represented, without the power to preserve the principle of equality in the division of assets among the creditors.

Section 5242 reads as follows: "All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void." Whatever the true intention of Congress may have been in enacting the fore-

going statute should prevail over the literal sense of the terms used. "A thing within the intention of 'the Legislature in framing a statute is sometimes as much within the statute as if it were within the letter." Interstate ·Drainage & Invest. Co. v. Board of Com'rs, 158 F. 270, 85 C. C. A. 532; Rigney v. Plaster (C. C.) 88 F. 686.

[5] The real purpose of the act seems to have been to declare void any transfer of property or payment of money by a national bank "after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in ˚the manner prescribed by this chapter, or with the view to the preference of one creditor to another." The following is in point: "The spirit or reason of the law will prevail over its letter * * * words may accordingly be rejected and others substituted." 36 Cyc. 1108c, and cases cited. It was also held in Ozawa v. United States, 260 U. S. 178, 43 S. Ct. 65, 67 L. Ed. 199, that "it is the duty of this court to give effect to the intent of Congress. Primarily this intent is ascertained by giving the words their natural significance, but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail." Transfer of real estate owned by a national bank was involved in Stapylton v. Stockton, 91 F. 326, 33 C. C. A. 542; such real property was conveyed by the bank to secure a loan of money at a time when the bank was alleged to have been insolvent, or in contemplation of insolvency. This case would serve the purpose here of showing that no question was raised as to the applicability of section 5242 to transfers of real estate, and it will be noted that the court in that case held that such transfer of real estate under said section, to secure a loan then obtained, and of which all creditors presumptively received the benefit, was not invalid.

[6] Complainant does not raise an issue over the cash withdrawals made by defendant and her daughter shortly before the bank closed, taking the position that they occurred in the ordinary and usual course of banking business; defendant's counsel hold that, if such is the case, "then no question could have arisen regarding the transfers if defendant had withdrawn the full $17,000 and paid it

back over the counter as the purchase price of the land." It is not explained how $17,000, or any considerable portion of it, could have been drawn out of this bank, at that time, or how $15,551.20 of this amount could· be treated as a cash deposit subject to withdrawal, when it represented an indebtedness of bank to defendant, evidenced by certificates of deposit due at some future time. It was impossible to determine when the new certificates of July 12, 1923, were due; in tearing off the signatures, the date of maturity was also removed. It is a fair assumption from the evidence that these certificates were canceled when the defendant accepted the conveyances of the land. But the withdrawal of money from a checking or savings account usually may be made at any time. The money is there on demand, except that some banks require notice of withdrawal of savings accounts; but it does not appear that the bank in this case required such notice. The defendant and her daughter apparently had complete control over both forms of account. "It cannot * * ` be said that all payments made in the due course of business" by a bank, when the officers know its condition is that of actual insolvency, are "made in contemplation of insolvency, or with a view to prefer one creditor to another." McDonald, Receiver, v. Chemical Nat. Bank, 174 U. S. 610, 19 S. Ct. 787, 43 L. Ed. 1106. If, however, a bank is hopelessly insolvent and the officers know it, as they should, they must also know that, when depositors appear at the window and check out their accounts, payments made on such checks will necessarily result in a preference to the person receiving such payments, and yet, when such payments are made in the ordinary course of business to a customer of the bank having a checking account, depositing and withdrawing funds at will, and who testifies that she made no demand for her funds of the bank at the time, it might be inequitable to compel such person to pay back the money, if it was received in good faith. It has been held that "a construction which would give such an effect to this statute [as to repayment] ought not to be indulged, in the absence of clear and explicit language requiring it." Roberts v. Hill, supra.

The circumstances relating to the cancellation of the new certificates of deposit and the transfer of all of the unincumbered real estate of the bank to defendant were unusual, to say nothing of the irregularities attending the transaction.

7 F.(2d)—44

I have examined, in vain, the authorities cited by defendant to find justification for such a disposition of the assets of a bank, on the brink of ruin, as is afforded by a consideration of the transcript and exhibits—books and papers of the bank—in this case. Transactions actually occurring in "due course of business," in "the ordinary way," and while "meeting all demands in the regular course," do not require such alterations of the books and records of a bank to give them the semblance of "due course" and "regularity." If this transfer of real estate was not made in contemplation of insolvency and to prefer defendant over other creditors, and to prevent the application of the principle of equality among its creditors, then what I feel obliged to accept as strong circumstantial evidence must be treated as mere suspicion. In my opinion the real estate should be reconveyed to the bank and the amount of the purchase price restored as a credit in defendant's account on the books of the bank.

Entertaining these views, I am obliged to order a decree for complainant, setting aside the conveyances of real estate belonging to this bank.