TECUMSEH NATIONAL BANK, APPELLEE, V. CHAMBERLAIN BANKING HOUSE ET AL., APPELLANTS.

FILED DECEMBER 4, 1901.   No. 10,165.

Commissioner's opinion, Department No. 2.

1. **National Bank:** BANK EXAMINER NOT ITS AGENT. A bank examiner who takes charge of the assets of a national bank, under the directions of the comptroller, is not the agent for the bank in such negotiation as the bank may be permitted to enter into with a view to the resumption of business.

2. ———: ———: REPRESENTATIONS OF EXAMINER NOT BINDING. When a defaulting officer of such bank, for the purpose of replenishing the assets of the bank to enable it to resume business, is allowed to furnish collateral securities for his indorsements upon paper previously sold by him to the bank, representations made by such examiner as to the liabilities of such officer to the bank and the value and condition of the securities already furnished by him, are not binding upon the bank; and one who furnishes collateral securities to such defaulting officer to be so used by him can not rely upon such representations of the examiner as a defense in an action by the bank to foreclose its lien upon such securities.

3. **Defaulting Officer:** HIS AGENCY: POWER OF DIRECTORS. Such bank, being represented by a majority of its board of directors, who are not in default, may, with the consent of the comptroller, accept such collateral securities from such defaulting officer; and in obtaining securities from a third person to be used by him for that purpose, such defaulting officer will not be regarded as the agent of the bank. His representations as to his liability to the bank, and the value and condition of the securities already furnished by him, will not be binding upon the bank, so as to enable the person furnishing such securities at his request, with knowledge of the purpose for which he intends to use the same, to rely upon such representations as a defense in a subsequent action by the bank to foreclose its lien upon such securities.

4. **Contract by Defaulting Bank Officer:** SECURITIES: CONSIDERATION. The contract of a defaulting bank officer to furnish collateral security for his indorsement upon paper previously sold to the bank by him so as to replenish the assets of the bank and enable it to resume business, is not illegal, and after such securities have been furnished and the bank has resumed business, the person furnishing such securities at the request of such defaulting officer with knowledge of the use to be made thereof by

him, can not be heard to say that there was no consideration for furnishing the same.

5. **Principal and Agent:** REPRESENTATIONS BY THIRD PARTY. When a principal is represented by a duly authorized agent, and some third person who may also be benefited by the transaction, assumes, without the knowledge or consent of the principal or his agent, to make representations and statements to promote the transaction, the principal will not be bound thereby, although he accepts the benefits of the transaction negotiated by his agent.

APPEAL from the district court for Johnson county. Heard below before HALL, J. *Affirmed.*

*J. W. Deweese, M. B. C. True, Isham Reavis, Robert Ryan* and *Reavis & Reavis,* for appellants.

*Samuel P. Davidson, contra.*

SEDGWICK, C.

On the 16th day of October, 1891, the comptroller of the currency, through the bank examiner, closed the doors of the Tecumseh National Bank and took possession of its assets. The embarrassment of the bank was caused by excessive loans to Russell & Holmes, and by discounting a large amount of commercial paper upon which they were indorsers. The firm of Russell & Holmes was composed of James D. Russell, who was a director in the bank, and Charles A. Holmes, who was also a director and was president of the bank. They also held a majority of the stock of the bank. After the examiner had taken charge of the bank, an effort was made to reopen the bank for business, and the comptroller proposed to allow such action to be taken if Russell & Holmes would pay in cash their direct indebtedness to the bank so as to reduce it to $5,000, the limit allowed by law, and would also satisfactorily secure their indirect liability as indorsers. Russell & Holmes appear to have still retained the confidence of the people to a considerable extent, and succeeded in obtaining accommodation notes from the farmers and others of their

business acquaintances, sufficient to enable them to pay to the examiner the amount required to be paid upon their direct indebtedness; and also put up various collateral securities for their liability as indorsers, and among such collaterals the banking stock in question in this suit, which is seventy-two shares of $100 each of the capital stock of the Chamberlain Banking House of Tecumseh. Charles M. Chamberlain was at the time cashier of the Chamberlain Banking House, defendant, and the defendant Edith R. Chamberlain is his wife. She is also the daughter of James D. Russell of the firm of Russell & Holmes. Soon after the bank was closed by the examiner she was induced to, and did, assign this stock to the Tecumseh National Bank, and delivered it to her father, who deposited it with the bank as collateral to the indebtedness and liability of Russell & Holmes and the individual members of that firm. The securities being approved by the comptroller, the bank resumed business, but the liabilities of Russell & Holmes to the bank have not been satisfied. This action was brought in the district court of Johnson county to foreclose the lien of the plaintiff bank upon said bank stock so assigned. Upon the trial of the cause in the district court there were findings and a degree in favor of the plaintiff bank, and the defendants Edith R. Chamberlain and the Chamberlain Banking House have brought the case to this court by appeal.

1. It is contended by the plaintiffs in error that the transfer of the stock is voidable because Edith R. Chamberlain was induced to assign the same by the misrepresentations of the officers and directors of the bank and the national bank examiner. The trial court made the following finding of fact:

"To obtain the assignment and transfer of said certificate by his daughter, James D. Russell said to her that everything had been straightened up at the bank; that she would not lose the stock; that they simply wanted it for a short time in order to enable Mr. Griffith to make a better showing to the comptroller at Washington; that the

paper it was to secure had been passed on by the directors, and said to be good, but that in any event, in case the paper was not good, there was other collateral—$30,000 of his and Mr. Holmes's life insurance; also stock in the banks at Sterling, Elk Creek and Johnson, and stock in the stone quarry company—so hers would not be touched. Similar statements were made by the examiner to her husband, to her brother-in-law, and in the presence of the witness, Mr. Rood; each of whom reported to her what the examiner had said. Edith Russell Chamberlain relied on what her father said to her, and on what her husband, her brother-in-law and Mr. Rood reported to her was said by Mr. Griffith, the examiner, and was thereby induced to make said assignment and transfer of said stock."

And the following conclusions of law:

"Although James D. Russell was a director of plaintiff bank at the time he made the statements to his daughter, Edith Russell Chamberlain, on which she relied, and which induced her to assign and transfer her said stock, yet as he was then acting for himself alone and not for or on behalf of the plaintiff, his statements, however false and fraudulent they may have been, were not the statements of the plaintiff, nor made in its behalf, and were not binding on plaintiff.

"John M. Griffith, national bank examiner, had no authority to make representations of any kind which could in law bind the plaintiff bank. His powers are defined by the national statutes. Each person dealing with him is bound to know the extent of his authority. His statement to Charles M. Chamberlain, to Clarence K. Chamberlain and in the presence of Rood, which they reported to defendant, Edith Russell Chamberlain, were not binding upon plaintiff bank, were not such as he had power to make, and were not such as, though false, would give defendant a standing in equity to avoid the said transfer of her said stock to plaintiff."

It is insisted that the finding of fact is not supported by the evidence, and it is argued that because Russell's inter-

est would be subserved by the bank's resumption of business, therefore, in the absence of evidence on that point, it can not be presumed that Russell did not represent his bank interest as well as his individual interest. But we think that this position is not well taken. The evidence shows that Russell had borrowed a large amount of money from the bank, and incurred large obligations to the bank by his indorsements, with Holmes, of commercial paper transferred to the bank. It is true that Russell & Holmes were directors of the bank, and as such officers had, with the other three directors, control of the affairs of the bank; but they also had personal individual business with the bank, and in their personal transactions with the bank they could not represent the bank nor participate in such representation. When they incurred obligations to the bank or furnished further securities for existing obligations, they represented only themselves. Some one else acted for the bank. All of the difficulties of the bank arose out of the inability of Russell & Holmes to square themselves with the bank. This they undertook to do. They did not have sufficient funds of their own. It was necessary to call upon their friends. Mr. Russell, after he had exhausted all other resources, went to his daughter. He asked her to help him, not the bank. She was requested to place her stock so that Mr. Russell could use it as he used his own resources, that is, to regain his standing in the bank, and continue the bank in business. The circumstance that the assignment was direct to the bank, instead of to Russell and by him to the bank, has no significance. She trusted her father with her bank stock, to be used by him as his own, and for his own purposes. Mrs. Chamberlain and her advisers knew that Russell was acting for himself in procuring her stock. No doubt, in obtaining this security, he served his "bank interest" as well as his "individual interest"; but he represented his individual interest, and the bank in this transaction was represented by the other three directors and not by Russell, as the dealing was directly between Russell and the bank.

His position in this transaction is not left in doubt by the evidence. It is, of course, true that after the bank examiner had closed the doors of the bank and taken possession of its assets, the officers of the bank could not transact its ordinary business, and any attempt by them to do so without the consent of the comptroller would be nugatory; but, on the other hand, it is undoubtedly true that under the law the comptroller was clothed with discretionary power to allow the bank to resume business if proper provisions were made to restore its assets, and enable it to comply with the requirements of the national banking law. When the bank, through its three disinterested directors, undertook to do this, the comptroller, through the examiner, consented, and informed the parties that, if they could make such arrangements as to restore the financial condition of the bank, the examiner would return the control of the assets to the bank officers. When the officers of the bank undertook, with that understanding, to make such arrangements, it was understood by all parties that any contracts that they attempted to enter into to that end were subject to the condition that they should succeed in restoring the assets of the bank, and be thereby enabled to receive full control of the affairs and business of the bank from the comptroller; that is, the bank examiner did not undertake to conduct the negotiations, but allowed the parties to go ahead and make their own contracts, bearing in mind that they would be of no force and could not be carried out until the assets of the bank were restored. The contracts and arrangements were thereupon made between the parties upon that condition. It was outside of the duties of the examiner, and outside of the authority conferred upon him, to negotiate for the replenishing of the assets of the bank. From that time, in regard to these negotiations, the comptroller, through the examiner, acted rather as a disinterested arbitrator between the officers of the bank, who were desirous of opening its doors, and the creditors of the bank, for the protection of whose interests he had intervened, than as the agent of either

party.  Any information that he might give to either party interested would be entirely voluntary on his part.  When the friends of Mrs. Chamberlain went to the examiner for information they did so at their own risk, and can not hold the bank responsible for his statements.  It is very clear that Mr. Griffith was not the agent of the bank in the transaction in question.  "He had no authority, as such (examiner), to act for the bank in any manner, and could not bind it by any act done or undertaken in its behalf. He represented a department of the government which supervises and controls the banks as to whether in certain cases they shall do business at all or not; but it does none for them, other than to wind up their affairs for their creditors.  The examiner makes report to that department to furnish a basis for action with reference to the continuance of the banks in business.  His reports might be favorable or otherwise, as any advice he should give might be followed.  He doubtless acted for the best interests of the creditors of the bank in giving this advice, but what was done in following it had no more effect than as if it had been done without it."  *Witters v. Sowles,* 32 Fed. Rep., 762,764.  The appointment of a receiver does not work a dissolution of the corporation. *Bank of Bethel v. Pahquioque Bank,* 81 U. S., 383, 20 L. Ed., 840.  The authority of its officers is not destroyed, but partially suspended, and the result of the proceedings may be that the corporation is dissolved, or its powers fully restored, and this will depend upon conditions as they may be developed, or may be brought about, by prompt action on the part of those interested in the bank.  In the meantime the examiner, from the time he takes possession, has certain designated powers and duties.  He must take possession of the books, records and assets of every description of the association and may collect the debts due and claims belonging to it, but he is given no general powers to act for the corporation.  When he   1 to Mrs. Chamberlain's advisers that he wanted the liabilities of Russell & Holmes provided for, and that arrangements were being made to induce the

comptroller to authorize the bank to resume business, and that he wanted to make as good showing to the comptroller to that end as possible, he was acting in the line of his duty, and no one could possibly be deceived in regard to his position in the matter. And when he further stated to Mrs. Chamberlain's advisers that everything had been straightened up at the bank, that she would not lose the stock, that the paper it was to secure had been passed upon by the directors and said to be good, and other representations in regard to the condition and value of the securities that had been turned over to the bank by Russell & Holmes, Mrs. Chamberlain's advisers must have known the capacity in which he was acting, and that he had no authority to bind the bank by statements of that character, and had no knowledge in regard to the condition and value of the securities, except that they had been passed upon by the directors; and they were bound to know, and must certainly, under the circumstances, in fact have known that Mrs. Chamberlain, if she furnished these securities, was furnishing them to Mr. Russell, that her contract was entirely with him, and that the transactions were had for the purpose of enabling Russell & Holmes to so far make good their default with the bank as to make it proper and safe on the part of the comptroller to authorize the bank to resume business.

2. The suggestion that the contract of Russell & Holmes with the bank was illegal, and therefore the guaranty of Mrs. Chamberlain void, is without merit. The authority of *Banking Co. v. Rautenberg*, 103 Ill., 460, has been questioned, and if it is to be regarded as a correct exposition of the law it is not in point here. In that case, after an officer of the bank had already borrowed beyond the legal limit, the bank made him a further loan. The surety on this loan was held not liable. The court held that the note given by him to the bank for the further loan was illegal and void, and any guaranty of its payment by a third person equally void; but the rule, so far as we are aware, has never been extended to a case like the one at bar. In the

case of *Denison v. Gibson*, 24 Mich., 186, 194, Gibson sold his bank stock to Mrs. Denison's husband and others, and Mrs. Denison pledged her separate property as security upon the deferred payments to Gibson, and it was held that "the agreement of the surety is not binding where the bargain between the primary parties, out of which it springs, is contaminated by positive illegalities." No such condition exists in this case. It was not illegal for Russell & Holmes to restore to the bank what they had unlawfully drawn therefrom, and their agreement with the bank which involved the use of Mrs. Chamberlain's securities did not contemplate that they should withdraw funds from the bank, but rather that they should restore funds already borrowed. No doubt it was in the interest of every stockholder, including Russell & Holmes, to have the liabilities of Russell & Holmes to the bank provided for; and it was also in the line of the examiner's duties to encourage this. The suggestion that these securities were given the bank to secure an existing indebtedness, and that the contract containing the original indebtedness was illegal, is also without foundation. The evidence does not show that the liabilities of Russell & Holmes were incurred in pursuance of an illegal contract between themselves and the bank, but rather that it was created by the misconduct of Russell & Holmes, and without the consent of the bank.

3. It is argued that, as "Russell & Holmes were, both by law and by subsisting contract, bound to make good their obligations expressed in their indorsements, or to secure them, hence a promise to extend the time in which to do it could be no consideration for doing it." But the agreement was that Russell & Holmes should give further securities for their liability to the bank, and upon doing so their relations with the bank should be restored, and they receive the benefits that would obviously accrue through such restored relations. They manifestly would derive advantages, under these arrangements, from furnishing additional security. Their agreement to give such

security was executed, and the assets of the bank passed from the hands of the comptroller, and other changes in the interest of the stockholders and creditors of the bank were made as contemplated in their agreement, and they can not now be heard to say that there was no consideration for furnishing this security.

4. It is also argued that if a principal avails himself of the fruits of the unauthorized acts of his agent, he thereby authorizes those acts and they become binding upon the principal. But this rule of law has no application here. The unauthorized acts relied upon were not the acts of the agent of the bank, nor of any one who assumed to act for the bank in the transaction in question. As we have already seen, the bank was acting through the three directors not personally interested in the transaction, and not through Russell & Holmes or the bank examiner. If an agent is employed to transact the business of his principal and in doing so goes beyond his authority, the principal who employs him and who accepts the results of his employment must accept also the obligations assumed by his unauthorized acts. But where a principal is represented by a duly authorized agent, and some third person, who may also be benefited by the transaction, assumes, without the knowledge or consent of the principal, to make representations and statements, the principal will not be bound by such statements. *Spurgin v. Traub,* 65 Ill., 170. In this case the three disinterested directors were the proper parties to represent the bank, and assumed to do so and acted for the bank in making the arrangements with Russell & Holmes. They made no representation to Mrs. Chamberlain, and they were not aware that either Mr. Russell or the bank examiner had made the representations in question. The bank, through these directors, received these securities from Mr. Russell, and there is no evidence indicating that there was any collusion between the officers who transacted this business on the part of the bank and Russell & Holmes or the bank examiner. The bank, therefore, is not chargeable with the representations made by them.

It is therefore recommended that the decree of the district court be affirmed.

OLDHAM and POUND, CC., concur.

By the Court: For the reasons stated in the foregoing opinion the judgment of the district court is

AFFIRMED.