WEDELL, J., not sitting.

No. 32,660

ED HUFFMAN, *Appellee,* v. LaRue C. WILKES, LEON SHANTON, LEE CARSON and FRED GASSER, *Appellants.*

(55 P. 2d 366)

Opinion filed March 7, 1936.

*Sullivan Lomax,* of Cherryvale, *John Bertenshaw* and *Kirke C. Veeder,* both of Independence, for the appellants.

*C. E. Pile,* of Parsons, and *James A. Brady,* of Cherryvale, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action for damages predicated upon the alleged wrongful acts of defendants in refusing to permit the teller of a bank on which it was drawn to pay plaintiff's check, he having to his credit in a checking account the amount of his check. The case was here before (140 Kan. 637, 37 P. 2d 988), where the court held the petition states a cause of action as against a general demurrer. After that decision an answer and reply were filed. There

was a trial by a jury, which answered special questions and returned a verdict for plaintiff. Defendants have appealed.

The bank was not sued. Persons who were officers of the bank were sued as individuals for their alleged individual, as distinct from official, wrongdoing, causing loss to plaintiff.

Shortly stated, plaintiff in his petition alleged that on May 2, 1931, the Montgomery County National Bank of Cherryvale was an open, going banking institution, receiving deposits, paying checks (except plaintiff's), and transacting a general banking business in the usual and ordinary manner; that defendants were officers or directors of the bank, and the position of each is described; that they were present at the bank and in charge of its business; that by reason of deposits previously made by him in the bank he had a credit in his checking account of $1,977.04; that within banking hours the afternoon of that day he went into the bank and presented his check, properly drawn on the bank, for that amount, to the paying teller for payment; that she started to pay the check when one of the defendants interfered with her, took the check, conferred with the other defendants, with the result that the teller was not permitted to pay the check, and payment was refused. The petition sets out the acts and conduct of the respective defendants in great detail, which we need not repeat here since they are quite fully stated in our former opinion. It is further alleged that the bank had currency and coin sufficient to pay the check, and that defendants, severally, jointly, and in conspiracy with each other, wrongfully prevented the payment of the check, to plaintiff's damage in a sum named. The petition contained a second cause of action for damages for loss of time, attorneys' fees and exemplary damages, predicated on the alleged willful, fraudulent and malicious misconduct of defendants.

The answer admitted defendants were officers of the bank, as alleged, and that plaintiff had a credit in his checking account at the bank to the amount alleged, and in effect admitted plaintiff had presented his check and that it was not paid. It alleged the bank had been having financial difficulties; that for more than a week prior to the date the check was presented a national bank examiner had been at the bank making an examination of its affairs under the authority of the federal banking department; that he had discovered irregularities of one Dillman, who had been president of the bank prior to May 2, 1931, and had determined and advised

defendants that the affairs of the bank must be put in better condition and that certain notes must be collected or better secured if the bank was to continue in business, and that he directed the deposits of that day be segregated as received from other assets. It is further alleged that defendants were endeavoring to comply with these requirements, and on the day in question conducted the affairs of the bank under the direction of the bank examiner; that when plaintiff's check was presented, late in the afternoon, there was not sufficient money then on hand to pay it; that defendants referred the question of its payment to the bank examiner, who directed them not to pay it; that the bank was in fact insolvent at that time, although defendants were still endeavoring to restore its solvency; that defendants informed plaintiff the bank was unable to pay the check, and that they acted in good faith in so doing, and denied generally allegations of the petition not admitted by the answer.

The reply was a general denial, with the plea the bank examiner had no authority to direct the affairs of the bank, such authority being vested in defendants, who were its officers and directors.

The evidence may be summarized as follows: The bank had been having some financial difficulties for a time. Apparently that had become known to some extent, for between April 17 and May 2 about $18,000 of deposits had been withdrawn. On April 27 a national bank examiner, P. V. Miller, and an assistant, began an examination of the bank. Miller continued at this work up to and including May 2. The bank did not open for business after that date. Later a receiver was appointed, who closed up its affairs. The bank examiner discovered shortages, and asked for the resignation of W. L. Dillman as president. He resigned the last of April, and LaRue C. Wilkes was elected president. Miller continued to examine the financial affairs of the bank, the value of its assets, and the security for its notes, and to advise the bank officials what should be done. The morning of May 2 he suggested to Wilkes that the deposits of that day be kept segregated from other assets of the bank, and that was done until after closing time. Throughout the day, when a customer made a deposit, a teller would enter the amount of the deposit in his pass book or give him a duplicate deposit slip, as was customary for an ordinary deposit, but the money or checks deposited would be placed on the counter and left there. The amount of the deposit was not posted in the bank's

books, nor was the money or other items deposited mingled with other money or items of the bank. The total deposits that day amounted to $4,718.37, none of which was paid out by the bank to anyone. Of the amount deposited $2,566.89 was in checks on other banks; the balance was in cash. After the closing time of the bank that day the employees posted the deposits of that day and placed the money and checks deposited in the safe. This was later turned over to the receiver. The morning of May 2 the cashier, Shanton, told one of the directors, Carson, the bank could not run through the day without some money. Carson went to Independence and got about $3,000 in cash for the bank's use. The bank began business that morning with $3,169.94 actual cash on hand, of which only about $370 was on hand when the bank closed business for the day. When plaintiff presented his check to Miss Hoffman, the teller, for payment she testified she picked up money and started to count it to pay the check, and found she did not have enough to pay it. She stepped a few feet to another employee, who had worked longer in the bank, told her the situation, and asked what to do, and was referred to the cashier, Shanton, who had just come into the room. Shanton took the check and began talking to plaintiff. Miss Hoffman did not pay the check, nor did she see it again, nor did she have any further talk with plaintiff.

The afternoon of May 2 plaintiff met Dillman on the street and talked with him a few minutes. He then went to the bank and asked Miss Hoffman what his account was. She looked it up and told him. He asked her to write a check for him for the amount; she did so; he signed it, and handed it to her for payment. We quote his testimony as to what took place in the bank, as shown by the abstract:

"Miss Hoffman counted out quite a bunch of money and took the check and stepped over to Miss Conrad. . . . She said something which I did not hear. She then started to the south door and Mr. Shanton stepped into the room. He took the check with him and went to the rear part of the bank. . . . Mr. Shanton came back in about five minutes and came to see me. I was outside of the counter in the lobby. He had my check in his hand. He wanted to know why I was checking my money out. I told him I had a little deal on and my father was not expected to live and I had to have that money. He said, 'Your money is worth one hundred cents on the dollar. This bank is backed by the Federal Reserve Bank at Kansas City, Mo. I told him that did not make any difference to me, I wanted my money and had to have it and demanded it. He broke down in a half cry and said, 'Dillman has fetched this on, hasn't he?' I says, 'No, sir, he has not. . . .' We

stood there and talked and Mr. Wilkes came out. Mr. Wilkes said, 'Huffman, what is wrong, why do you want your money out?' I told him about the same thing I told Mr. Shanton. Mr. Wilkes said, 'This bank is a member of the Federal Reserve, your money is worth one hundred cents on the dollar. While we admit we have loaned a little bit close, the bank is absolutely all right.' I said to him, 'Mr. Wilkes, I demand my money and I want it.' . . . He assured me that the bank was absolutely all right. He said he would see what he could do for me and let me know. . . . Mr. Wilkes came back and said, 'I will see what I can do for you and let you know in a little bit.' Mr. Wilkes went to the rear of the bank again. I went out of the bank a little bit, not to exceed five minutes. When I came back to the bank, I saw Mr. Shanton, Mr. Carson and Doctor Gasser. Carson was in the back room and there was a stranger came out about that time with a brief case in his hand. I never saw that man afterward. I still demanded my money and Gasser wanted to know why I wanted it. He said he had more money in the bank than I had, that the bank was absolutely all right and my money was worth one hundred cents on the dollar. I demanded my money the same as I did before. . . . I saw all the defendants in there and talked with them. I talked with Wilkes, Gasser and Shanton. The last talk I had in the bank with Mr. Wilkes, he told me he had twenty-five hundred dollars at Independence and he would pay that check the first thing Monday morning, it was impossible for him to pay me that day. I still demanded my money. Mr. Carson did not talk that I recall. The others did the talking. Mr. Shanton told me it was time to go and I had to leave. That was about 3:15 or 3:20. Mr. Shanton had my check in his hand the biggest part of the time. After they told me it was impossible for them to pay me before Monday morning, I tore the check up and threw it in the waste basket. . . ."

On cross-examination he was asked: "How many times did Mr. Wilkes tell you, 'Ed, we haven't got the money to cash your check,' " to which he answered: "I did not count them. He told me a number of times."

There is evidence tending to show that defendants conferred with the bank examiner about the check and were advised by him not to pay it. The evidence is not specific as to the time that day deposits were made or checks cashed except that only a few deposits were made in the afternoon, and there is no evidence that any check was cashed after plaintiff presented his check for payment.

The testimony of defendants as to what took place while plaintiff was in the bank conflicts with his testimony as to the assurances he says they gave him that the bank was sound, but we pass this, since it was the function of the jury and the trial court to weigh the evidence. For the same reason there is no purpose in pointing out conflicts between the testimony of plaintiff and that of the defendants on other matters. They agree with him that they told

him his check could not be paid because the bank did not have the money. There is no testimony that defendants used any physical violence toward plaintiff, or that they made any threats, or used any duress. Neither is there any evidence that defendants gained any financial advantage to themselves personally by the refusal of the bank to pay the check.

The bank examiner, Miller, was asked what value he assigned to the assets of the bank as compared with its liabilities, as he learned of them from his examination of the bank. He answered that he could not give the definite figure without referring to his report, "but the capital was practically wiped out." He was asked what he meant by that statement, and answered: "Well, the value of the assets were insufficient to practically absorb the liabilities."

The evening of May 2, which was a Saturday, one of the defendant directors of the bank approached R. H. Shaw, the vice-president and active manager for ten years of the Peoples State Bank at Cherryvale, told him something of the condition of the Montgomery County National Bank, and said it was the wish of the board of directors that the bank be taken over, or merged, or its assets purchased by the Peoples State Bank. By appointment the matter was gone over the next day. Shaw examined the notes owned by the bank, the securities for them, made inquiry of the financial standing of the makers, and also examined the liabilities of the bank. It was his opinion that the assets of the bank unpledged to secure the indebtedness of the bank at Kansas City were not enough "to anyways near take care of the deposit liability."

After a receiver was appointed for the Montgomery County National Bank one of the defendants went with plaintiff to the receiver, and together they explained to the receiver that plaintiff had presented his check for payment before the close of business May 2 and what took place on that occasion, and asked the receiver to consider a preferred claim for plaintiff. The receiver expressed his view that plaintiff had no grounds for a preferred claim. Plaintiff then filed a claim with the receiver as a common creditor, and later received dividends aggregating 14.63 percent of his claim, the same as all other common creditors of the bank.

This action was filed March 11, 1933. By the jury's verdict plaintiff received judgment on his first cause of action for $2,116.63, being the amount of the check he sought to have cashed, plus interest, less dividends he had received on his claim filed with the re-

ceiver, and $500 on his second cause, the same having been allowed by the jury for attorneys' fees. The jury specifically refused to allow plaintiff anything for loss of time, or for exemplary damages.

Turning now to the legal questions argued by counsel. We first note this is not an action against the bank as are some of the cases (*Kleopfer v. Bank*, 65 Kan. 774 70 Pac. 880; *Meinhart v. Farmers State Bank*, 124 Kan. 333, 259 Pac. 698) cited and relied upon by plaintiff. It is well established in this state and elsewhere that the relation between the bank and its ordinary depositors is that of debtor and creditor, hence, the correct viewpoint is that by reason of deposits plaintiff had previously made the bank was indebted to him in the amount of the balance shown by his checking account. It is presumed, of course, to be able to pay its debts to depositors on demand. When plaintiff presented his check to the bank, and payment was refused, plaintiff immediately had a cause of action against the bank for the amount of his deposit. Plaintiff pursued that method of recovery, not by bringing an action against the bank, but by presenting his claim as a common creditor to the receiver, and was paid his prorata share of his claim, as were other creditors in his class, being all the bank was financially able to pay; hence these authorities are of no aid to plaintiff in this case. Neither is this an action against the directors because of any statutory liability, as *Ramsey Petroleum Co. v. Adams*, 119 Kan. 844, 241 Pac. 433, cited by appellee. Defendants in that case were directors of a state bank, and the action was predicated upon state statutes (R. S. 9-163, 9-164) which make the directors, under certain circumstances, personally liable to depositors for receiving deposits when the bank is insolvent. Here the bank in question was a national bank. The state statute relied upon in the Ramsey case has no application to it, and the action is not one to recover a deposit made while the bank was insolvent. We need not stop to consider whether there is a federal statute which, under any circumstances, imposes personal liability on officers and directors of national banks, for if such statutes exist the plaintiff did not predicate his action thereon. No reference to such a statute is made at any place in the record or briefs in this case.

The action is founded in tort against defendants personally, not as officers or directors of the bank, for damages for their alleged personal wrongdoing which resulted in the bank's refusal to pay plaintiff's check during the business hours of May 2 and before the bank was closed as a going concern.

The real question in the case is whether what defendants did, as shown by the evidence, was in their capacity as officials of the bank, or whether it was a personal wrongful interference with plaintiff's business in such a way as to make them personally liable.

It is true, as contended by appellee, that national bank examiners are not officers or agents of the banks which they are examining and cannot bind such banks by acts, in their official character as examiners. (*Witters v. Sowles,* 32 Fed. 762; *Tecumseh Nat. Bank v. Chamberlain Banking House,* 63 Neb. 163, 88 N. W. 186; *Carlton v. First Nat. Bank,* 80 Ore. 539, 157 Pac. 809.)

However, the continued existence of a national bank may depend upon its compliance with suggestions or requirements made by the bank examiner to its officers and directors (12 U. S. C. A., § 501a). This is a matter which defendants as officers and directors of the bank were entitled to take into consideration in conducting the affairs of the bank on the day in question.

Appellants complain, with some reason, that the trial court, in interpreting the former decision of this court in this case, gave to the decision too wide a scope. In overruling the demurrer to the evidence the court indicated that defendants had no defense to the first cause of action, and something of the same thought seems to pervade the instructions given. At our former decision the court had before it only plaintiff's petition and defendants' demurrer thereto. The petition alleged in detail the acts of defendants and was prolific in its characterization of them as being wrongful. Defendants had demurred to the petition, thereby admitting, for the purpose of obtaining a ruling on the demurrer, the facts pleaded in the petition. The petition contained no allegation that the bank was insolvent, or that its financial condition was such that acts of insolvency, or in contemplation of insolvency, had been performed, but on the other hand had alleged that it was a going banking concern, transacting all kinds of banking business in the usual course (except as it refused payment on plaintiff's check). Defendants in this court argued that the bank was insolvent and in serious financial distress. This court gave no heed to that argument, and held defendants were not then in position to urge it (140 Kan. 641). However, it did not close the door so as to prohibit the consideration of that question on the trial of the case. In the opinion it was said:

"It may be that when an answer is filed and the evidence is produced a different case will be established than was alleged in the petition. . . ." (p. 642.)

Clearly, the decision was predicated upon the view that the petition alleged the bank to be a solvent, going concern. To the extent the trial court interpreted the former decision of this court in this case as precluding or in any way limiting a defense predicated upon the insolvency of the bank because of acts of insolvency, or in contemplation of insolvency, the interpretation was erroneous.

Quite a little is said in the briefs about the segregation of deposits made May 2. We know of no statute providing for such segregation. Ordinarily, at least, the question whether a deposit is general or special is determined at the time the deposit is made. This accords with the court's instructions on that point. Here the deposits were made—certainly so far as the depositors were concerned—in the ordinary manner deposits are made by customers having checking accounts at the bank and for the purpose of having credit in such accounts. They were general deposits. The fact that the bank officials kept the deposits on a desk separate from other assets of the bank until after closing time, and then entered the deposits on their books and placed them in the safe, does not change that situation. It is not especially unusual, however, when a bank is being investigated as to its solvency, and it is doubtful if it is solvent, and its officers desire further time to consider the solvency of the bank, and perhaps to raise funds which would insure its solvency, for deposits received to be segregated much as they were in this instance. Perhaps two ideas prompt such action. The officers may think it would aid their defense if they were prosecuted later for receiving such deposits when the bank was insolvent, and knowing it to be such; and, second, there are circumstances somewhat allied to this in which deposits made have been declared trust funds and the depositors entitled to preferred claims, even though there was no definite understanding to that effect between the depositor and the bank officials at the time the deposit was made. We regard what was done with reference to segregating deposits in this case as having no bearing on the rights of the parties, except to the extent that it shows an act of insolvency, or in contemplation thereof, and its bearing on the good faith of the bank officials in conducting the affairs of the bank.

Appellants complain of the refusal of the trial court to give instructions requested and of instructions given. They called the attention of the court to the federal statute, 12 U. S. C. A. § 91, which reads:

"All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction or execution shall be issued against such association or its property before final judgment in any suit, action, or proceeding, in any state, county, or municipal court. (R. S. § 5242.)"

They asked the court to give instructions defining "an act of insolvency, or in contemplation thereof," as used in the statute, and setting forth the duties of defendants as directors of the bank in such a situation. The court refused to give such instructions, but on the other hand told the jury in substance that if the bank was open and doing business with the public it was its duty to pay the checks (large or small) of the depositors, if properly made out and duly presented, and that their intentional refusal to do so constituted willful negligence and rendered each of them personally liable in the full amount of the check; and further instructed that if defendants, as directors of the bank, feared that the payment of plaintiff's check at the time it was presented, May 2, 1931, would imperil the solvency of the bank, such fear is not a defense to either cause of action stated in plaintiff's petition.

These rulings were erroneous. The court should have instructed the jury as to what constitutes acts of insolvency, or in contemplation thereof, as those terms are used in the federal statute cited, and as defined by the federal courts. (See: *McDonald, Receiver, v. Chemical Nat'l Bank*, 174 U. S. 610; *Irons v. Manufacturers' Nat. Bank* (6 Biss. 301), 13 Fed. Cas. 7068; *Roberts v. Hill*, 24 Fed. 571; *Ball v. German Bank*, 187 Fed. 750; *Browne v. Stronach*, 7 F. 2d 685; *Federal Intermediate Credit Bank v. L'Herisson*, 33 F. 2d 841; *Federal Reserve Bank v. Omaha Nat. Bank*, 45 F. 2d 511; *First Nat. Bank of Ortonville, Minn., v. Andersen*, 57 F. 2d 17; *Smith v. Baldwin*, 69 F. 2d 390; *Aycock v. Bradbury,* 77 F. 2d 14; *Pearson v. Durell*, 77 F. 2d 465; *Aufderheide v. Mine Safety Appliance Co.*, 9 F. Supp. 918.)

There is much in the evidence which, under appropriate instructions, would have justified the jury in finding acts of insolvency,

or in contemplation thereof, as those terms are used in the federal statute, and as defined by the decisions, of which the above list makes no pretense of being complete—the heavy withdrawal of deposits in the two previous weeks; the discovery of shortages by the bank examiner; the requested resignation of the president; the strenuous efforts to get money for business May 2, details of which have not been stated; the segregation of deposits for the day, with the possibility they ultimately would be held to be special deposits; the examiner's conclusion the capital of the bank was wiped out and its assets practically insufficient to pay its liabilities; the refusal to pay plaintiff's check, under the circumstances, and the fact that no check of a depositor was paid thereafter, were all matters the jury would have been justified in taking into consideration in determining those questions.

The fact that the officers of the bank still entertained some faint hope that the bank was solvent, or might be made solvent, and made statements to plaintiff that the bank was sound, would not be sufficient to defeat the real and necessary effect of their acts of insolvency, or in contemplation thereof. Such hopes and statements are discussed in some of the cases above cited and passed over as being ineffectual. More than that, in this case they had no influence upon plaintiff; notwithstanding them, he still demanded his money. If the payment of plaintiff's check for the full amount of his deposit, under the circumstances, would have permitted him to have a preference in the distribution of the assets of the bank under a receivership, it was the duty of defendants, as officers of the bank, to refuse payment, even though the bank had money on hand with which to make it, and had the payment been made under such circumstances the receiver could have recovered it from the plaintiff in an action therefor. This is specifically ruled in the Aycock and Pearson cases, above cited. It is true this statute has been held not to apply to the cashing of checks and withdrawal of deposits in ordinary course of business, but where the amount and the circumstances of the withdrawal and the effect of the withdrawal would be to give a preference over other creditors of the bank, and certainly if the evidence discloses that such was the intention of the party withdrawing the money, the cashing of the check would be a void transaction. There is evidence here from which the jury might have found that situation to exist. The instructions of the court

should have been framed so as to present those matters to the jury. The fact this was not done, in view of defendants' request, requires a reversal of the judgment of the trial court.

Our own decision dealing with this federal statute (*Bodley v. Bowman*, 131 Kan. 741, 293 Pac. 740) is in harmony with the federal decisions.

The retrial of this case also should take into account the rule that officials of a corporation, in transacting its business, are presumed to act for and on behalf of the corporation rather than in their individual capacities, and that ordinarily any liability to third parties which arises by reason of such acts is the liability of the corporation and not the individual liability of the officers. (*Beeler & Campbell Supply Co. v. Riling*, 132 Kan. 499, 296 Pac. 365; *Noll v. Boyle*, 140 Kan. 252, 36 P. 2d 330; *Lathrop v. Hall*, 141 Kan. 909, 44 P. 2d 201.)

Appellants make a specific complaint of the judgment in favor of plaintiff for $500 for attorneys' fees on the second cause of action. The jury specifically found plaintiff was not entitled to recover anything for exemplary damages. The evidence sustains that view. The result is plaintiff has been allowed an attorneys' fee in a common-law action for tort. This cannot be permitted to stand. The retrial of this case should be on the first cause of action only.

The judgment of the court below is reversed with directions to set aside the judgment for $500 attorneys' fee, and to grant a new trial in harmony with the views herein expressed on the first cause of action only.

DAWSON, J. (dissenting): I cannot assent to the ruling that the instructions of the trial court, as summarized in the opinion, were erroneous, nor in the court's discussion of "preference." So long as the bank was a going concern the question of preference could not arise in this case. It was the defendants' duty as officers to pay or close the bank.